## Testa v. Dorchak

*George E. Anthou,* for plaintiff.

*William C. Porter,* for defendants.

SWEET, P. J., December 12, 1966.—Mary Ann Testa has sued Emil Dorchak, a justice of the peace, and Harry K. Garber, a deputy constable, in trespass. Defendants demurred and the case came on for oral argument to ascertain whether she has alleged a cause of action. It seems that before January 23, 1966, plaintiff was involved in a matter of disorderly conduct. Using registered mail, Emil Dorchak, J. P., mailed a summons for a hearing to plaintiff. On January 26, 1966, at or about 12:01 a.m., he issued another summons for the same offense. (Parenthetically, we might remark that this particular action ended favorably for Mrs. Testa as a result of certiorari, but after this was long over, she was rearrested and apparently pled guilty and paid the costs.) In the instant case, Dorchak and Deputy Constable Garber "drove to the Plaintiff's home and served this second Summons on the Plaintiff at her home at or about 12:55 A.M. on the 26th day of January, 1966." Mrs. Testa says that this service was an "intentional abuse of legal process in that:

"(a) The warrant was served at an unreasonable, improper and absurd hour after it was issued.

"(b) The warrant was employed for an unlawful purpose, to wit: to scare, frighten and alarm the Plaintiff.

"(c) The warrant was not utilized for the purpose for which it was intended by the law to effect, rather was a perversion of the warrant.

"(d) Said warrant was issued and served by the Defendants for purposes of their own in that it was a wrongful, unwarranted and an improper exercise of authority by said Defendants.

"(e) The Defendants purposely, maliciously, wickedly and mischievously conspired and agreed together

to have the Plaintiff served with the Summons for a second time.

"(f) The Defendants maliciously, wickedly and mischievously plotted together to effect their aforesaid malicious, wicked and mischievous purpose by striking and banging on the Plaintiff's door at 12:55 a.m. on January 26, 1966.

"(g) That the aforesaid service was oppressive in nature since the Plaintiff was previously in receipt of the first summons via registered letter (Exhibit "A").

"(h) The Defendants' further purpose(s) in issuing and serving the second Summons was to harass, to exhaust, to weary and to interfere with the Plaintiff.

"(i) The aforesaid Summons was utilized to invade the peace, quiet, comfort and privacy of the Plaintiff".

Plaintiff further claims that as a result of defendant's action, she has been exposed to "obloquy and contempt thereby causing extreme physical suffering. . . ." and has been "required to expend various sums of money for medicine and medical attention. . . ." She seeks pecuniary and exemplary damages from each defendant in an amount in excess of $5,000.

Defendants' demurrer asserted privilege and contended that their actions were proper. Defendants point out that the rules of criminal procedure do not contain any restriction as to the time of day or night as to which personal service may be made and further asserts that it is the law of Pennsylvania that constables, sheriffs, justices of the peace, etc., are immune from civil liability from the consequences of official acts which they perform.

At oral argument, plaintiff most strenuously asserted the invasion of the right of privacy. The thrust of plaintiff's strong brief is to the effect that the second service was oppressive, intentionally outrageous and unreasonable.

There has been a growing interest in recent years in the right of privacy.[1] "There can be no question that American jurisprudence recognizes the right of privacy; the only question being its limits": Mack Appeal, 386 Pa. 251 (1956). It was said in Mack that "the court below . . . was charged with the duty to protect the right of privacy of the prisoner. . . ." and so it would follow that we are charged here, a fortiori, to protect the right of privacy of persons merely accused and not then convicted of crime.

It has been held in Georgia that unlawful entry of a person's home by officers for the purpose of arresting a husband without warrant or legal authority is a violation of the right of privacy of a wife, if she was present and suffered from shock and fright as a result thereof.[2]

The scope of the right of privacy in Pennsylvania, which has developed by traditional case law accretion, is not especially wide: see Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433 (1937); Harlow v. Buno Co., Inc., 36 D. & C. 101 (1939); Clayman v. Bernstein, 38 D. & C. 543 (1940). No case similar to the instant one has been found in Pennsylvania. Dorchak and Garber are not charged with taking Mrs. Testa's picture [3] or republishing her artistic endeavors without authority. The question here is whether by

---

[1] The legal interest in privacy first attained significance through an article "The Right to Privacy", by Samuel D. Warren and Louis D. Brandeis, 4 Harv. L. Rev. 193 (1890). See also 77 C. J. S. 397 et seq.; Restatement, Torts §867.

[2] Walker v. Whittle, 33 Ga. App. 445, 64 S. E. 2d 87 (1951),

[3] There is a fascinating conflict of authority on the right of public officers to take and retain photographs, measurements, fingerprints, etc., of persons accused but acquitted. See Hodgeman v. Olsen, 86 Wash. 615, 150 Pac. 1122; People ex rel. Gow v. Bingham, 107 N. Y. S. 1011 (1907), and the cases which develop two lines of authority.

proceeding to her home at 12:55 at night to serve a second summons, they made her neighbors too aware of her "criminal status" so as to violate her right of privacy.

Every arrest violates privacy to some extent, and so does the holding of a hearing or the maintenance of criminal records. These normal law enforcement activities seem to be either a privileged infraction of the right to privacy, or more likely an area of activity outside the right. For instance, the annotation Right of Privacy, to be found at 77 C. J. S. 396, is a little unclear as to the rationale, but definite as to the result.[4]

Miller v. Gillespie, 196 Mich. 423, 163 N. W. 22 (1917), concerns the suit of an acquitted defendant to have all references to him in the criminal records expunged or given up for destruction. The Supreme Court of Michigan said:

"Once it is conceded that the rule of the police department is unreasonable and that plaintiff has the right to have this record destroyed, the conclusion is inevitable that the officers of the department have committed a wrong which may be redressed at the suit of an individual. The right of the individual to privacy, to be let alone so long as he does no wrong, is in law, when no resulting pecuniary injury or injury to property rights is involved, rather intangible. Alleged invasions by an individual of this alleged right and the jurisdiction of a court of equity to amend the alleged wrong have been considered by the courts, [citing cases]. None of these cases involve the wrong of ex-

---

[4] "It has been held or recognized that the mere making by officers of the law of identification records of persons in custody on criminal charges, including the record of fingerprints, does not constitute an unwarranted invasion of the right of privacy, and that an innocent person who has been arrested cannot have the police record destroyed, such record being true, and not exposing him to ridicule, obloquy, or disgrace, and not being a wrongful invasion of his right of privacy": 77 C. J. S. 396 at 403.

posing the person complaining to disgrace, ridicule, or obloquy, and none of them sustain the right of the complaining party to injunctive or other equitable relief. . . . None of them is authority for granting relief in the case at bar. . . ."

Relief was refused accordingly.

Mrs. Testa was subsequently convicted of disorderly conduct. It would seem that she would have no right of privacy to have the records expunged. A fortiori, she would not have a right of privacy sufficient to prevent notoriety being given orally or otherwise in the neighborhood of the fact of her arrest.

Convenience reinforces logic here. The law of arrest is already sufficiently complex. If the arresting officers were obliged to make an arrest in a furtive manner, so that neighbors or bystanders would be unaware that an arrest was taking place, the difficulties would be multiplied. As long as the action of malicious prosecution remains available, we do not think we need to create, by construction, a right of privacy to erect an immunization from arrest. It would be extremely difficult to specify limits here. The probable cause rule is sufficiently well implemented today to protect the right of the citizen not to be arrested for idle, fanciful, unverified or unconstitutional reasons. To create another judge-made bar to arrest would be cumulative and superfluous.

The Warren and Brandeis article referred to hereinabove suggests two other reasons why the right to privacy affords Mrs. Testa no firm foundation here. They said the rule against publications which violate privacy would not prohibit ". . . any publication made by one in the discharge of some public or private duty. . . ." To the extent that the neighbors heard the service of the summons, her privacy may have been invaded, but it would seem obvious that the service of process is "a public duty". Much to the same effect is

another limitation expressed by Warren and Brandeis: "The law would probably not grant any redress for the invasion of privacy by oral publication in the absence of special damage". They go on to say that "The injury resulting from such oral communications would ordinarily be so trifling that the law might well, in the interest of free speech, disregard it altogether". To be sure, the law of the right of privacy has grown since its initial recognition in 1890. However, the Pennsylvania cases studied do not furnish any illustration of an invasion of the right to privacy by limited oral communication. Mack Appeal, supra, for instance, concerned the publication of the prisoner's picture in the newspaper.

We hold squarely here that the right of privacy *as such* does not entitle any person under these or similar circumstances to freedom from arrest and does not make the arresting officer or process server liable.

The other facet of the case is concerned with the oppressiveness of defendants' conduct. Assuming, arguendo, that some right of plaintiff was violated here, we come to the question of privilege. It has been held that " '. . . all judicial officers are protected by their official character from liability in tort, because of public conduct clearly within the pale of their authority, although involving demonstrable legal error' ".[5] That opinion goes on to say:

"The strong trend of authority has been to apply the same rules to judges of courts of general jurisdiction and to those of limited jurisdiction, such as justices of the peace, city magistrates, and other officers with special judicial functions, when acting in a judicial capacity".

Here, it is asserted that Dorchak and Garber went to serve a summons when one had already been mailed

---

[5] Commonwealth v. Cauffiel, 79 Pa. Superior Ct. 596 (1922) at 600, quoting from 25 C. J. 515.

to plaintiff, and that this action is inherently oppressive. It was undoubtedly redundant. However, we do not wish to hold that the service of a superfluous summons is as a matter of law harassing and oppressive. It would seem that the action of Dorchak and Garber in this service was thus within the pale of their authority, although obviously not essential to the jurisdition of the justice's court. As was said in Cauffiel: "His determination was none the less judicial because he erroneously decided that the warrant should issue", even though he issued a second summons when the first was adequate.

There is some conflict in the law of Pennsylvania as to just how far the judicial privilege protects squires. In McNair's Petition, 324 Pa. 48 (1936) at page 55, it is said that magistrates ". . . cannot be subjected to liability, civil or criminal, for any of their judicial acts, no matter how erroneous, so long as they act in good faith".

In McCarthy v. DeArmit, 99 Pa. 63 (1881), on the other hand, it was said:

"If a justice of the peace, without reasonable cause, maliciously orders the arrest of a person for breach of the peace, or felony, he may be compelled to answer the injured party in compensatory damages, and, also, exemplary, proportionate to the wantonness and oppressiveness of his conduct".

Although this, in its context, was clearly dictum, it is still indicative of some limit on the conduct of the minor judiciary.[6] It is evident, however, that the ma-

---

[6] See also Gault v. Mitchell, a lower Philadelphia court case reported in 12 L. I. 238, (May, 1855), where Judge Knox said: "There is abundant authority for the position that an action will lie against a magistrate for maliciously and without probable cause, issuing a warrant of arrest, and holding a defendant to bail on a criminal prosecution". This case doesn't help Mrs. Testa in the present procedural framework, since she has never alleged that the prosecution was without probable cause. She was convicted.

liciousness and oppressiveness must be in substance, and not merely in manner. As was said in Hanna v. Slevin, 8 Pa. Superior Ct. 509 (1898), " . . . we all agree that in the absence of proof of fraud or corruption, the fact that the manner of the magistrate was rude and his judgment mistaken, would not give the prosecutor a right of action".

Perhaps the best review of the law on this is in a lower court case, Finkbeiner v. Chidsey, 44 D. & C. 579 (1942), from Northampton County. In form, this opinion is an analysis of the rights of the justice of the peace under the Act of 1772.[7] Parenthetically, we wonder why Dorchak and Garber did not seek the protection of this well-known act, but the record does not show that they did, and it is probably not self-executing.

Judge McCluskey said here, regarding the Act of 1772: ". . . . it is possible to infer that the legislature proposed to vouchsafe to the justices some measure of security in the execution of their office. . . . It is an explanation why the legislature did not go further and considered it unwise to grant complete immunity to the justices against civil suit for misconduct in office".

In the Finkbeiner case, the magistrate heard a $21.80 fenderbender. He said that he didn't like an applicable point of law and wouldn't apply it. Finkbeiner then sued the magistrate for wantonly, oppressively, wilfully and maliciously entering the judgment. Counsel for plaintiff did not serve the statutory notice upon defendant under the Act of 1772 and was nonsuited. The court said this:

"Where the motive of the magistrate is obscure and it is doubtful that he was acting in the execution of

---

[7] "The Act of March 21, 1772, 1 Sm. L. 364, which was almost a verbatim transcript of the English statute, 24 George II, c. 44, is a venerable monument in the statutory law of the Commonwealth: 42 PS §1011": Finkbeiner, supra.

his office, a solution undoubtedly would be to treat the question as a question of fact for the jury. Although the testimony might establish an arbitrary and unjudicial attitude, we find no evidence on the record of personal vengeance or fraudulent intent against Finkbeiner.

" . . . there can be no doubt but that the defendant alderman acted in the execution of his office".

Accordingly, the nonsuit stood and the magistrate was not required to make payment.

The analogy of this case to ours is fairly valid. The service of process in itself is not an oppressive thing. There is nothing on the record indicative of personal vengeance or fraudulent intent.

Unless the magistrate was plainly beyond the pale of his authority, it would seem that his privilege protects him. The only facts asserted in the complaint are that Dorchak and Garber served a second summons in the middle of the night on plaintiff at her home. These are not made worse by the rhetoric by which they are asserted, e. g., "an absurd hour", "mischievously plotted", "oppressive in nature".[8]

Under all these circumstances, therefore, we must say that the complaint does not assert facts amounting to enough to overcome the officer's privilege.[9]

---

[8] Garber is described in plaintiff's brief as having the role of "a sneery, second assistant tarantula-keeper", but there are no averments of fact in the pleading or readily inferrable therefrom to substantiate this construction. It has been disregarded in the above.

[9] It will be noted that we have tested this by the conduct of Dorchak, the magistrate, for Garber, the deputy constable was under his supervision all along. See also 42 PS §1016 (another section of the Act of 1772) for the derivative position of the constable. It has been held that the primary purpose of this section is to protect the constable when he acts in obedience to warrant and relieve him of liability for want of jurisdiction in justice issuing the writ and for any irregularity in the proceedings: Smith v. Houghwot, 132 Pa. Superior Ct. 501 (1938).

Accordingly, we sustain the preliminary objections. This does not mean that we endorse or encourage the practice of the magistrate going along on the service of the papers; nor do we recommend that a summons be served at 1:00 in the morning in a residential neighborhood. Since, however, the magistrate could lawfully have issued a warrant for Mrs. Testa's arrest and had her at least briefly incarcerated, it is hard for us to see that he was guilty of oppression.

In view of all the foregoing, it is apparent that plaintiff has not stated a claim for relief on the ground of oppression. Defendants' third contention, that no action lies for mere fright or harrassment apart from the physical harm, need not be decided here today in this context. Preliminary objections are sustained. Judgment will be entered in favor of defendants.