## Clairol, Incorporated v.
## Martin Wholesale Distributors, Inc.

*Wolf, Block, Schorr & Solis-Cohen, Burton Caine* and *Judah I. Labovitz,* for plaintiff.
*Samuel Smith,* for defendant.

### Pleadings and Issues

KELLEY, J., April 3, 1964—This is an action in equity brought by plaintiff, Clairol, Incorporated, to enjoin defendant, Martin Wholesale Distributors, Inc.,

from selling "professional" bottles of plaintiff's product to the public. Plaintiff's theory for relief is that defendant by selling the "professional" bottle, is guilty of unfair competition and that, as a result, plaintiff is likely to suffer irreparable harm by reason of seizure of its product by governmental authorities, customer dissatisfaction and loss of the benefit of its advertising program.

Defendant admits that the goods are sold as alleged but denies that plaintiff is entitled to relief. Alternatively, defendant suggests that it will attach a sheet of instructions to the "professional" bottles sold, contending that this will obviate plaintiff's objections.

On February 13, 1963, a hearing was held upon plaintiff's motion for a preliminary injunction, at which time it was ordered that a final hearing on the matter would be conducted on February 18, 1963. After hearing, the court did not grant the injunction prayed for but deferred adjudication.

As a result of the hearings, the court finds as follows:

### Findings of Fact

1. Plaintiff, a Delaware corporation with offices in New York City, is engaged in the business of manufacturing, advertising and selling cosmetic products which prominently feature the trade identification "Clairol" in one form or another. These products bear plaintiff's trademarks which are registered in the office of the Commissioner of Patents in Washington, D. C.

2. Defendant, Martin Wholesale Distributors, Inc., is a Pennsylvania corporation which operates three retail drug stores in Philadelphia at 921 Levick Street, 6838 Bustleton Avenue, and 7301 Frankford Avenue. At each of these three stores defendant sells cosmetics and other products at retail to the general public.

3. Among the items manufactured and sold by plain-

tiff is a line of products known as "Miss Clairol Hair Color Bath" (referred to hereafter as "Miss Clairol"). This line consists of products which are commonly referred to as permanent hair colors, that is, they impart various colors to the user's hair which will permanently remain in those portions of the hair shaft which have been exposed to them. These products contain derivatives of coal tar dyes.

4. In the past three years, plaintiff has expended over $30,000,000 in advertising its products, including "Miss Clairol". The latter product has accounted for over $12,000,000 of that advertising over that three-year period. Plaintiff has created a large business, a valuable reputation, and good will in the trade and among the general public under the name "Clairol".

5. "Miss Clairol" is manufactured outside of Pennsylvania and is sold and shipped by plaintiff in interstate commerce to purchasers in Pennsylvania.

6. Plaintiff sells, and has traditionally sold, its products, including "Miss Clairol", to two different channels of trade, i.e. (1) The professional trade consisting of beauty supply jobbers who resell the so-called "professional" bottles to beauty salons for ultimate use by beauticians qualified and licensed to color the hair of beauty salon patrons, chains of beauty salons staffed by qualified and licensed beauticians, and beauty schools for use in the training of such beauticians, all referred to as the "professional trade"; and (2) the retail trade consisting of wholesalers, jobbers, and retailers for ultimate resale to the general public for use by lay consumers at home, hereinafter referred to as the "retail trade".

7. Plaintiff sells its 2-ounce bottles of "Miss Clairol" to all of its professional trade customers for 36¢ each, and to all of its retail trade customers for 67¢ each. This price differentiation has been traditional for "Miss Clairol" since that product's introduction in

1950 and the substantially lower price for professional merchandise is mandated by plaintiff's need to meet the competition which exists in the professional trade.

8. "Miss Clairol" is packaged by plaintiff in individual 2-ounce bottles, each of which contains sufficient material for a normal, single, full-head application. Prior to June, 1963, plaintiff sold such bottles of "Miss Clairol" to both the professional and the retail trade in the identical form. Each of the bottles bore the same label, except for the individual shade name and number, and each was enclosed in the same bright yellow carton which contained a printed sheet of instructions.

9. In or about June, 1963, plaintiff inaugurated a differentiation between the packaging of "Miss Clairol" for each of the two classes of trade in the Metropolitan New York area. This differentiation was introduced into the Philadelphia area in November, 1963.

10. The product sold by plaintiff to the retail trade (referred to hereafter as the "retail package") is packaged in the identical form that previously had been used in both the professional and the retail trade—that is, the bottle, bottle label, carton, and instructional insert have remained the same. However, the product sold by plaintiff to the professional trade (hereinafter referred to as the "professional bottle") is now packaged differently. The same glass bottle that is sold to the retail trade is used for the professional trade, but the bottle label has been changed, one revision being the inclusion of the following at the top thereof:

"PROFESSIONAL USE ONLY
WARNING
Cautionary statements regularly required for sale to non-professionals and instructions essential to the use of this product by non-professionals are not included on bottle labels. Non-professional sale may result in prosecution under federal law."

11. Further, the professional bottles are no longer packed in individual cartons, but rather are placed in a single carton containing six bottles. The outer portion of this carton features on its two main panels the same warning statement quoted in finding 10. Within each such carton of six individual bottles, plaintiff includes a single printed slip which advises the performance of a preliminary patch or skin test on the prospective user for detecting hypersensitivity to coal tar dyes and which sets forth the manner in which such a test should be performed. No other instructions for the use of the product are furnished by plaintiff in the packaging of the professional bottle, thus accounting for the warning referred to above. No change has been made in the product itself, the contents of the professional bottle being of a chemical composition exactly the same as the contents of the retail package. Plaintiff does not sell its professional bottles to the retail trade, nor its retail packages to the professional trade.

12. By making these package changes, plaintiff realizes substantial savings. Plaintiff, in thus selling to the professional trade, is able to eliminate the cost of packing each bottle in an individual carton and of enclosing with it a separate instructional insert, neither of which serves an important function for that trade. These cost savings of 1.2 cents per bottle will amount to $200,000 to $300,000 per year.

13. One-third of plaintiff's sales of "Miss Clairol" is to the professional trade and two-thirds to the retail trade. Despite the fact that sales to the beauty trade do not produce substantial profit for plaintiff company, it is necessary for plaintiff to continue selling to the beauty trade at a low competitive price because it is important to success in the retail trade that plaintiff receive the endorsement of the professional hairdresser.

14. "Miss Clairol" as packaged and sold by plaintiff for the "retail trade" consists of the hair coloring bot-

tle, the detailed instructions for use, and the yellow cardboard box.

15. As early as January, 1964, defendant has displayed, offered for sale and sold at retail, professional bottles of "Miss Clairol" which contain in red ink the warning: "PROFESSIONAL USE ONLY", etc., as set forth in finding 10 above, without the yellow carton, without any instructions whatsoever for the use of the product, and without any directions for performing the patch or skin test for determining hypersensitivity to the coal tar hair dyes contained in "Miss Clairol".

16. In using "Miss Clairol" without instructions the following adverse consequences may result:

(a) A woman who is hypersensitive to coal tar hair dyes is likely to experience as a result of their use a severe and harmful allergic reaction in which the skin which comes in contact with the liquid (normally the scalp, face, neck and surrounding areas) becomes red, swollen and itchy, causing painful stinging, all of which may take months to disappear.

(b) The consumer may not know that the product should never be used without the protection of rubber gloves. As a result, she is very likely to find her skin and finger nails stained for a substantial period of time. In addition, cuts and bruises on the hands may be subjected to painful stinging and burning sensations.

(c) The untrained user may not know that only a special purpose and gentle strength permanent wave solution should be used after the application of "Miss Clairol". In addition, the consumer may not know that "Miss Clairol" should not be used immediately after a permanent wave treatment. The use of the wrong type of permanent wave solution after the application of "Miss Clairol" can cause substantial hair breakage or frizzling. The use of "Miss Clairol", immediately after a permanent wave treatment, can cause painful stinging sensations on the scalp.

84

(d) The consumer may select and apply a shade which will not produce the desired color change or so misuse the shade she has selected as to fail to achieve the desired degree of lightening.

(e) A purchaser of the "Ermine" or "Starlight" who uses either of these shades alone is likely to find her hair turning yellow or muddy brown. This discoloration cannot be corrected, and the user must wait until her hair grows sufficiently long to permit the discolored portion to be cut away.

(f) A user may fail to perform a preliminary strand test which might result in hair breakage or discoloration.

17. All of consequences outlined in finding 16 above are minimized by proper use of the instruction sheet.

18. In addition, "Miss Clairol" is subject to deterioration upon exposure to sunlight. While plaintiff's retail package contains no reference to this fact, the individual retail carton does protect the bottle contents from such exposure until, after purchase, the user removes the bottle from the carton. After such removal the full contents of a bottle are normally used for a single application, and even if not, plaintiff's directions state: "Discard any unused mixture; it becomes useless." Each of the bottles in the professional six-pack carton is protected from sunlight while in that carton, and beauty salons, for whom that package is intended, are instructed by plaintiff's textbooks to avoid exposure of the individual bottles to sunlight. Defendant's practice of displaying professional bottles on open shelves and selling them without protecting cartons is more likely to cause deterioration of the product both in defendant's store and in the hands of the purchaser and result in the consequent dissatisfaction of users.

19. Plaintiff's use of a cardboard container for its retail package is designed to assure receipt of the direc-

tions by each purchaser for home use. On the flap of its lid is printed the reminder:

"READ ENCLOSED
DIRECTIONS BEFORE
USING."

20. Defendant's display of "Miss Clairol" in naked professional bottles lacks the attractiveness of appearance of the cardboard container, the result of plaintiff's promotional planning and packaging designing which has been widely and expensively advertised.

21. Customers experiencing an allergic reaction or painful stinging and burning sensations, stained skin and finger nails due to the absence of rubber gloves, damage to the hair, and/or bizarre results such as the hair turning a bright Kelly green, are likely to attribute their misfortune to Clairol Incorporated, the manufacturer, rather than defendant, the drug store which sells the product improperly. Plaintiff may thus be subjected to claims and lawsuits notwithstanding the absence of any culpability or wrongdoing on its part. This will force upon plaintiff the expense of defending such lawsuits in addition to the damage to its good will and reputation suffered by the institution of such actions.

22. If Pennsylvania or federal authorities institute legal proceedings and seize and destroy defendant's stock of "Miss Clairol" as being "adulterated" under the Pennsylvania Drug, Device and Cosmetic Act of September 26, 1961, P. L. 1664, sec. 13, 35 PS §780-13(c), and the Federal Food, Drug and Cosmetic Act of June 25, 1938, c. 675, sec. 601, 52 Stat. 1054, as amended, 21 U. S. C. A. §361, the adverse publicity attendant upon such proceedings and seizures and such official characterization of "Miss Clairol" is likely seriously to injure plaintiff's good will and business reputation.

23. The professional bottles of Clairol sold by defendant had found their way into the possession of defendant after passing through the hands of the professional trade mentioned in paragraph 6.

24. There are well over 2,000 beauty salons in Philadelphia. Eight out of 52 salons in the general vicinity of defendant's stores made a retail sale of the professional bottle upon request and 39 refused to make such sales. Prices for all such sales were between $1.00 and $1.50 a bottle compared with defendant's price of 80¢ and 87¢ a bottle.

25. Defendant does not sell professional bottles of "Miss Clairol" in order to meet any substantial competition.

26. It is plaintiff's avowed policy to bring suit to enjoin the sale of the "professional" bottle at retail wherever such sales are discovered.

27. Plaintiff has no agreement with wholesalers or distributors that the six-pack professional cartons will not be sold to retailers for sale to the general public.

28. Plaintiff has no agreement with beauty salons that they will not sell the bottles contained in the six-pack professional cartons to the general public either by selling the entire carton or individual bottles.

### Discussion

It is fundamental that a manufacturer has a legally protectable trade interest in seeing that its goods are marketed as originally packaged where, because of the condition thereof or the omission of necessary information, customers are likely to be deceived and the manufacturer's reputation adversely affected: R. B. Semler, Inc. v. Kirk, 27 F. Supp. 630 (1938); Coca-Cola v. Brown, 60 F. 2d 319 (1932).

In the instant case, it is clear that the sale by defendant of the naked "professional" bottles, without warning and directions, is in violation of section 601 of the Federal Food, Drug and Cosmetic

Act, 21 U. S. C. A. §361, which provides as follows:

"A cosmetic shall be deemed to be adulterated—(a) If it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual: Provided, That this provision shall not apply to coal-tar hair dye, the label of which bears the following legend conspicuously displayed thereon: 'Caution—This product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows; to do so may cause blindness.', and the labeling of which bears adequate directions for such preliminary testing . . ."

Defendant's violation of the statute subjects the goods to *in rem* seizure, condemnation, and destruction under section 304 of the act: 21 U. S. C. A. §324.

The Pennsylvania Drug, Device and Cosmetic Act, of September 26, 1961, P. L. 1664, 35 PS §780, has provisions similar to the Federal Act. Section 780-13(c) of the Pennsylvania Act is patterned after 21 U. S. C. A. §361 of the Federal Act.

Like its Federal counterpart, the Pennsylvania law provides for an exemption if the warning legend appears on the product and adequate directions for conducting the patch test are included. Otherwise the cosmetic will be deemed "adulterated". Moreover, section 780-12 of the Pennsylvania Act, like its Federal counterpart, provides for the seizure and condemnation of adulterated cosmetics.

It seems to the court that if the cosmetics were seized by governmental authorities pursuant to the statutes heretofore cited, the consumer would be likely to conclude that the product itself was adulterated and place the blame on Clairol. This would, of course, injure the good will of plaintiff. In addition, the court feels that

the other hazards as set forth in the findings of fact connected with the use of the product, without instructions, inevitably would lead to customer dissatisfaction.

We conclude therefore that the defendant should be enjoined from selling the naked "professional" bottle without instructions. It must be pointed out, however, that even if the defendant were to furnish the instructional sheets with the naked bottle when selling to the purchaser untrained in its use, this would not eliminate the deterioration of the product which results when the bottle is sold without a protecting carton. For that reason defendant must also be enjoined from selling the naked bottle, even with instructions.

Plaintiff also seeks to enjoin the selling of the "professional" bottle at retail, in any form, contending that it has established a nexus between the advertised product, which is always advertised in the yellow carton, never the bottle, and the product displayed at the point of sale; that if this nexus is destroyed, every other advertising, packaging, merchandising and marketing effort of plaintiff is rendered totally nugatory. Thus, plaintiff contends that if defendant is permitted to sell at retail the "professional" bottle, *in any form*, plaintiff will be deprived of the benefit of its advertising program and consequently its good will will be irreparably harmed.

Good will is a property right cognizable in equity and damage thereto will be enjoined under the doctrine of unfair competition: R. B. Semler, Inc. v. Kirk, supra; Coca-Cola Co. v. Brown, 60 F. 2d 319 (M.D. Pa. 1932); Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433 (1937).

Plaintiff relies on a series of New York cases wherein the court enjoined the sale of the "professional" bottle under similar facts. See e.g. Clairol, Inc. v. L. H. Martin Value Center, Inc., 244 N.Y.S. 2d 210 (1963). However, we feel that the New York cases are not persuasive for two reasons:

First, the basis of the New York cases is the finding that defendant had violated a New York penal statute which makes it unlawful to package another's goods: Clairol, Inc. v. L. H. Martin Value Center, Inc., supra, at 212. To the extent that dictum in the case of Lanvin Parfums, Inc. v. LeDans, Ltd., 9 N.Y. 2d 516, 523, 174 N.E. 2d 920, 922-923, suggests that an advertising program should be protected under the doctrine of unfair competition, we feel that such a holding is unsound and will not follow it.

Second, this court is not convinced that there is such a nexus between plaintiff's advertising of its product in the yellow carton and its appearance at the point of sale that plaintiff's advertising would be rendered nugatory by a sale other than in a package furnished by plaintiff. There is no evidence to support such a contention. Indeed, it presumes the public consumer to be naive. Even assuming that consumer loyalty is to some extent fostered by such a psychological technique as advertising, this is a dubious ground for preserving to the seller the exclusive right to profit by it. Cf. James M. Treece, Copying Methods of Product Differentiation: Fair or Unfair Competition? 38 Notre Dame Lawyer 244, 259, 260. Our research has revealed no Pennsylvania case holding or strongly suggesting that an advertising program should be judicially protected and we see no reason why it should be.

This court will not stamp approval to a policy which will inhibit price competition to preserve an advertising program which can readily adjust itself to the situation by proclaiming to the market the value of its product even without the yellow box. This court is not oblivious to the fact that psychologically sound selling techniques serve a useful function economically in the affairs of men. However, the court feels that any gain plaintiff would achieve by enjoining all sales of the "professional" bottle at retail, except as dictated by it,

is far outweighed by the public interest in, and need for, competition. The consumer should be entitled to benefit from the price reduction, resulting from the natural interplay of the forces of competition.

To enjoin defendant from sales of the product in any form would be to protect the unascertained impact of plaintiff's advertising on the sale of its product to the detriment of the consumer pocketbook.

While it is undoubtedly true that defendant receives some benefit from the advertising generated by plaintiff, we do not consider this so improper a utilization of plaintiff's good will as to enjoin any sale of the product, except as defendant permits, particularly where, as in this case, the public is the prime beneficiary of defendant's sales.

Although our research has found no case in point in Pennsylvania, we agree with the rule of law set forth in 87 C. J. S. Trade-Marks, §97, at pp. 344-345, which is as follows:

"It does not constitute unfair competition for a retailer of a commodity sold under a trade name to sell it in different quantities and in other containers as the genuine article, as long as he makes it clear to the public that the bottling or packing is done by himself, and so long as he does not resort to change or adulteration of its composition."

If defendant attempts to repackage and resell "Miss Clairol" goods with instructions, it will be incumbent upon it to insure that plaintiff's trademark rights are not violated. Cf. Bayer Co., Inc. v. Shoyer, 27 F. Supp. 633 (1939) ; R. B. Semler, Inc. v. Kirk, supra.

We hold only in this regard that plaintiff is not entitled to restrain the retail sale of the "professional" bottle unless accompanied by its instructions and its carton.

### Conclusions of Law

1. Plaintiff possesses a substantial good will and an excellent business reputation under its name "Clairol"

and trade-marks featuring that term, which constitute valuable property rights.

2. Defendant's sale to the public of uncartoned bottles of "Miss Clairol" without directions is likely to injure plaintiff's good will by reason of customer dissatisfaction or bad publicity resulting from a governmental seizure of the product as adulterated.

3. Defendant's sale of the uncartoned bottle, even with instructions, is likely to damage plaintiff's good will because of the deterioration the product undergoes when it is sold without a protecting carton.

4. The injury to plaintiff's good will by reason of the above will be irreparable and not compensable by money damages.

5. If defendant resold plaintiff's product with a protective carton and with proper warnings and instructions for safe use, there would be no chemical difference between the product in the retail bottle and the "professional" bottle.

6. Plaintiff's advertising program is not protectable under the doctrine of unfair competition, particularly where it has not established a clear connection between its program and its sales.

7. Defendant's benefit from plaintiff's advertising program is not an improper utilization of plaintiff's good will.

### Final Decree

And now, March 15, 1965, upon consideration of the petition of plaintiff and upon hearing thereon, by agreement of counsel, the prayer of the petition is granted and the court hereby modifies the final decree by entering the following as its final decree:

Martin Wholesale Distributors, Incorporated, its agents, servants, employes and all persons or instrumentalities subject to the control of defendant, or affiliated or acting in concert with defendant, are enjoined and restrained from buying, stocking, displaying, offering for sale at retail, or selling at retail, any

Miss Clairol Hair Color Bath or any other product manufactured or distributed by Clairol Incorporated and bearing any of its trademarks or trade names which:

1. Is not labeled in full accordance with the requirements of the Federal Food, Drug and Cosmetic Act and the Pennsylvania Drug, Device and Cosmetic Act for products sold to untrained, lay consumers; or

2. Does not bear adequate instructions, as furnished by plaintiff, for the proper and satisfactory use of such product by untrained, lay consumers; or

3. Is not enclosed in the original, single bottle carton in which each such product was placed by Clairol Incorporated for general sale to the public; or which bears on the label thereof the statement:

"PROFESSIONAL USE ONLY
WARNING

Cautionary statements regularly required for sale to non-professionals and instructions essential to the use of this product by non-professionals are not included on bottle labels. Non-professional sale may result in prosecution under federal law."
or

4. Is not accompanied by the packaged insert placed by Clairol Incorporated in the carton for each of its products for general sale to the public; or

5. Bears or did bear labeling, including bottle labels, package inserts, and bottle cartons, placed thereon by Clairol Incorporated which has in any way been defaced, removed, altered, amended, or supplemented by persons other than Clairol Incorporated.