[Civ. No. 23226. Second Dist., Div. One. Nov. 19, 1959.]

NADELL AND COMPANY, INC. (a Corporation), Respondent, v. JOHN DOE GRASSO et al., Defendants; BEN ROSS, Appellant.

Allan S. Ghitterman for Appellant.

Tobias G. Klinger and Paul S. Leevan for Respondent.

LILLIE, J.—Plaintiff company, a Los Angeles concern in the business of purchasing goods damaged in transit, was granted a permanent injunction against the sale and distribution by defendant Ross of several hundred cases of refrigerated fruit salad except as specified in plaintiff's agreement with the vendor-carrier. Ross has appealed from the judgment awarding such preventive relief.

In June of 1956, plaintiff purchased from Southern Pacific Company a quantity of Kraft-brand fruit salad in pint, quart and gallon jars. The goods had become frozen in transit, causing the tops of the containers to expand and rise above the jars. Desiring to avoid an involvement with Kraft, whose name appeared on the lids of the containers, Southern Pacific provided in its sale of the salvaged merchandise to plaintiff that the latter would not permit the goods to enter retail outlets under the Kraft label. Plaintiff was also notified that a violation of this proviso would result in a severance of further business relations with Southern Pacific, one of its principal customers.

Later that month plaintiff sold the entire shipment to one

Vizcarra. It was explained to Vizcarra that other lids and containers would have to be used in the event of a resale; Vizcarra replied that he would put the goods in his own plastic containers, return all the lids and containers to plaintiff and sell the product to retailers under his own label. The invoice signed by Vizcarra read as follows: "Mdse. To Be Removed From Jars. Caps, Jars And Cases To Be Returned To Nadell & Co., Inc."

During this entire period, it appears from the record, defendant Ross was an employee of plaintiff, acting in a managerial capacity. It further appears that Ross knew of the restriction imposed by Southern Pacific, suggested Vizcarra as a possible buyer and assisted plaintiff's vice president in the wording of the invoice evidencing the sale. Subsequently Ross left plaintiff's employ and in November of 1956, negotiated with Vizcarra for the purchase of a part of the shipment. On January 9, 1957, Vizcarra sold Ross 125 pint cases and 145 quart cases of the fruit salad in their original containers. Thereafter Ross refused to return the jars and caps to plaintiff, actually sold a portion of the goods in the Kraft containers to a certain retailer and indicated his intention to dispose of the remainder without regard to the restriction imposed by plaintiff. The present action was then commenced.

Although other contentions subsidiary thereto are presented, the main problem is whether the restriction as to resale is enforceable against Ross who was not a party to the contract with Vizcarra though on notice of its provisions. While the trial court noted that "courts have been reluctant to find and enforce equitable servitudes on chattels," such an interest was expressly found to have been created, and it was on that basis that injunctive relief was granted. The precise question, it is intimated in the briefs, has not been decided by an appellate court of this state.

■■■ We first dispose of appellant's subsidiary contentions. It is urged that the complaint failed to state a cause of action in that the restrictive condition or covenant, set forth *in haec verba*, is lacking in sufficient certainty to warrant enforcement by a court of equity. Following the rejection of similar claims by way of demurrer, upon the trial (and prior to the taking of testimony) appellant renewed his objection to the pleading's sufficiency; this objection was withdrawn "at the present time" when the court pointed out that leave to amend could be granted respondent, and the trial thereupon proceeded to its conclusion. One of the issues litigated was the certainty

of the contract and its applicability to appellant. ██ "Where the parties at the trial treat a certain issue as being involved, and the judgment is based on that issue, it is not a prejudicial error that the complaint defectively alleges, or fails to allege at all, that issue." (*Ades* v. *Brush*, 66 Cal.App.2d 436, 444 [152 P.2d 519].) ██ Nor do we believe, aside from the pleading problem, that there is merit to the argument that the parties' duties under the contract (specifically, the person obligated to return the jars) and the conditions of performance cannot be ascertained with reasonable certainty. ██ "Equity does not require that all the terms and conditions of the proposed agreement be set forth in the contract." (*King* v. *Stanley*, 32 Cal.2d 584, 588 [197 P.2d 321].) The usual and reasonable conditions of such a contract are, in contemplation of the parties, a part of their agreement (*Martin* v. *Baird*, 124 Cal.App.2d 598, 601 [269 P.2d 54]). ██ That rule has particular application to the facts of the present case, where the evidence shows that appellant had been in the business of buying salvaged merchandise from Southern Pacific for several years prior to his employment by respondent, presumably was conversant with business custom and usage, and inferribly on that basis was charged with the responsibility of wording the restriction whose lack of certainty he now asserts. ██ Furthermore, where such claimed uncertainty exists, it is to be interpreted most strongly against the party who causes the uncertainty to arise (*Boring* v. *Filby*, 151 Cal.App. 2d 602, 605 [311 P.2d 869]; Civ. Code, § 1654). ██ Finally, where an instrument is susceptible of different interpretations, the one adopted by the trial court, if it appears to be consistent with the intent of the parties, and not the result of an abuse of discretion, will not be disturbed by an appellate court (*Medico-Dental Bldg. Co.* v. *Horton & Converse*, 21 Cal.2d 411, 430 [132 P.2d 457]). ██ Measured by any reasonable standard, the restriction is not void for uncertainty.

██ It is next contended that a prohibitory injunction will not lie "to prevent the breach of a contract . . . the performance of which would not be specifically enforced" (Code Civ. Proc., § 526, subd. 5). In *Anderson* v. *Neal Institutes Co.*, 37 Cal.App. 174 [173 P. 779], the court construed this statutory provision and declared that where a contract contains both affirmative and negative covenants, equity will not interfere to prevent a breach of the negative covenant when the affirmative covenant is of such a nature that it cannot be specifically enforced. Here there was arguably an implied

negative covenant in addition to the affirmative covenant to return the jars or containers. The test adopted by the decisions, however, is whether the terms of the covenant stipulate for a succession of acts whose performance cannot be consummated by one transaction, but will be continuous and require protracted supervision. ■■ "Courts of equity . . . will not decree specific performance when the duty to be performed is a continuous one extending possibly over a long period of time, and which, in order that the performance may be made effectual, will necessarily require constant personal supervision and oversight of it by the court" (*Poultry Producers of Southern Calif., Inc.* v. *Barlow,* 189 Cal. 278, 289 [208 P. 93]). ■■ That is not our situation—less than 300 cases of merchandise being here involved which would ordinarily be capable of disposal in one or, at the most, a very few transactions. For this reason, appellant's reliance on subdivision 5 of section 526, *supra,* is misplaced.

■■ Another point involves the claim that respondent has been guilty of unclean hands by its sale of merchandise to Vizcarra in the original containers—this, it is asserted, constituted a breach of the agreement with Southern Pacific. We cannot follow this argument, since the sale was expressly subject to the carrier's restriction; and even so, the issue was a factual one decided adversely to appellant's theory. (*Pon* v. *Wittman,* 147 Cal. 280, 291 [81 P. 984, 2 L.R.A. N.S. 683].) Nor is there merit to the final subsidiary claim that respondent failed to exhaust his legal remedies before recourse to equity; respondent, says appellant, could have repurchased the goods and then sought damages from Vizcarra for breach of the restriction. ■■ To have the effect of ousting the jurisdiction of a court of equity, the remedy at law must be speedy, adequate and efficacious to the end in view; it must reach the whole mischief and secure the whole right of the plaintiff in a perfect manner at the present time, not in the future (27 Cal.Jur.2d, Injunctions, 153, § 39).

■■ This brings us to the principal, and decisive, issue whether the facts and the law support the trial court's finding that an enforceable equitable servitude on the chattels in question was created by the transaction at bar. As it involved restrictions on the use of land, the doctrine of equitable servitudes was first applied more than 100 years ago in *Tulk* v. *Moxhay* (1848), 41 Eng. Reports 1143, and has been followed in this state (see *Werner* v. *Graham,* 181 Cal. 174 [183

P. 945]; *Marra* v. *Aetna Const. Co.,* 15 Cal.2d 375 [101 P.2d 490]). "Such servitudes are frequently spoken of as 'equitable easements' . . . They are opposed to the rule that the owner of land may not create new and heretofore unknown estates, and while their validity—that is, the enforceable character of such covenants as against grantees of the original parties—is now too well known to admit of question, it has resulted that the covenants which will be so enforced are limited to those which directly concern and benefit what we may term the dominant tenement" which is defined (Civ. Code, § 803) as the land to which the easement is attached (*Werner* v. *Graham, supra,* 180-181). Professor Chafee has suggested the existence of a dominant tenement as applied to restrictions on chattels: Thus, "the contract with a manufacturer for maintenance of prices of standardized articles or for limitations on their use is transformed from a promise to him personally into a proprietary interest in the articles for the benefit of his business as a dominant tenement" (41 Harv. L. Rev. 945, 964). Many years prior to the adoption of the Fair Trade Act (Bus. & Prof. Code, § 16900 et seq.), the Supreme Court in *Grogan* v. *Chaffee,* 156 Cal. 611 [105 P. 745, 27 L.R.A. N.S. 395], recognized the determinative role played by the good will of a business in the field of price-fixing, holding that there was nothing either unreasonable or unlawful in the effort by a manufacturer to maintain a standard price for his goods. "It is simply a means," the court stated, "of securing the legitimate benefits of the reputation which his product may have obtained." (P. 614.) In *D. Ghirardelli Co.* v. *Hunsicker,* 164 Cal. 355 [128 P. 1041], substantially the same question was involved—the product being chocolate instead of olive oil—and the court reaffirmed the principle upon which the Grogan case was rested. Of interest, furthermore, is the additional basis for the result reached by the court, to wit, that the contract in question was one for the benefit of a third person, the chocolate having been purchased by a wholesaler who later sold the product to the defendant. In *Max Factor & Co.* v. *Kunsman,* 5 Cal.2d 446 [55 P.2d 177], which sustained the constitutionality of the Fair Trade Act, the court declared: "In recent years there has developed . . . the concept that a manufacturer of a trademarked article that is sold in competition with articles of a similar nature and who has fixed a fair price at which he, as well as his distributor and retailer, can make a fair profit, has a property right in the goodwill toward his product which he created, and that

it is sound public policy to protect that property right against destruction by others who have no interest in it except to use it in a misleading way to deceive the public'' (p. 455). Hence, although not expressly so stating, each of the foregoing decisions (and others in accord not necessary to cite) would seem to support Chafee's ''dominant tenement'' approach to the problem. They also dispose of the objections raised in out-of-state cases examined in the Chafee article, although appellant here does not so contend, that limitations on the transferability of chattels are in restraint of trade.

The trial court's memorandum of opinion, made a part of the record on this appeal, makes mention of decisions from other jurisdictions which support the conclusion reached. They are based on broad equitable principles, typical of which is the following declaration in an early English case, *De Mattos* v. *Gibson*, 4 De G. & J. 276 : ''Reason and justice seem to prescribe that, at least as a general rule, where a man, by gift or purchase, acquires property from another, with knowledge of a previous contract, lawfully and for valuable consideration made by him with a third person, to use and employ the property for a particular purpose in a specified manner, the acquirer shall not, to the material damage of the third person, in opposition to the contract and inconsistently with it, use and employ the property in a manner not allowable to the giver or seller. This rule, applicable alike in general as I conceive to movable and immovable property, and recognized and adopted, as I apprehend, by the English law, may, like other general rules, be liable to exceptions arising from special circumstances . . .'' Judge Augustus Hand, speaking for the court in *In re Waterson, Berlin & Snyder Co.*, 48 F.2d 704, took note of *De Mattos* v. *Gibson, supra,* and observed that the gist of the decision was that ''one who takes property with notice that it is to be used in a particular way receives it subject to something resembling an equitable servitude'' (p. 708). Judge Hand continued : ''Courts in the United States have enforced rights resembling an equitable servitude binding on a third party who has acquired personal property from one who is under a contract to use it for a particular purpose or in a particular way'' (p. 708). Cited is the case of *Murphy* v. *Christian Press Ass'n. Pub. Co.,* 38 App. Div. 426 [56 N.Y. Supp. 597], where the court enjoined the purchaser of electrotype plates for the printing of a certain book from printing and selling the book at a price far less than that prescribed by the assignor's agreement with the owner of the copyright; as

here, the purchaser had notice of the restrictive agreement. The court there said (p. 598) : "The agreement on the part of the defendant's predecessor in title, though technically a personal one, related to the use of its property, the copyrights and the plates, and obligated all who might acquire that property with notice of the agreement. This is the settled doctrine of the court of appeals where the agreement relates to real estate (citations). We can see no reason why the same rule should not apply in the case of personal property . . ." Another case cited by Judge Hand is *New York Bank-Note Co.* v. *Hamilton etc. Co.*, 31 N.Y. Supp. 1060 [65 N.Y. St. Rep. 38], in which it was held that a purchaser with notice is bound by an agreement with its predecessor in title and the manufacturer of printing presses which contained the restriction that the presses could not be used for strip-ticket printing. The court reasoned (p. 1063) : "Contracts restraining the carrying on of a trade or business within certain limits are held to be valid. Why not contracts prohibiting personal property from being used in a particular way?" Still another decision in support of the proposition is *P. Lorillard Co.* v. *Weingarden,* 280 F. 238 more similar to the case at bar. Plaintiff-manufacturer sold a quantity of cigarettes to a certain company; it was agreed that they would not be resold in this country since they had become dry, stale and not up to the standard sold by Lorillard on the domestic market—the sale, in consideration of these factors, being at a reduced price. Subsequently defendant purchased the cigarettes with knowledge of the restriction, imported a portion of them into this country and threatened to import the remainder for sale at a lower price than that at which its brand was being sold by Lorillard. Injunctive relief was granted Lorillard, the court declaring (p. 240) : ". . . a court of equity will enforce a restrictive covenant, if it is reasonable and made within proper limitations. There does not seem to me anything unreasonable in the reservations under consideration."

Appellant seeks to distinguish the general reasoning of these and other cases presented by respondent. Stating that in all of the situations therein presented the servitude was one which expressly set forth what was to be done, when and by whom, he argues that there was here merely "a loose statement of intention without any offer of evidence to clarify its intent." We have already determined that this contention, going to the certainty of the contract, is without merit. Appellant further contends, however, that all of the cases relied on

for affirmance of the judgment involve servitudes imposed by the manufacturer of the product or, as in the instance of copyrights, the creator of the item or idea; here, it is asserted, the restriction is created by a third person on a product he did not manufacture and for a different reason than that for which the original restriction was imposed. As to the reason for the restriction, the attempted distinction seems more imaginary than real, since both respondent and the vendor-carrier obviously wished to insulate themselves from possible claims on the part of the producer should the latter's goods reach the consumer market under its label but in an unsatisfactory condition. The remaining question whether the restriction could be imposed by a nonproducer of the goods and subsequently enforced against persons with notice thereof but without having made any direct agreement to respect such restriction, was partially suggested but not decided in *Grogan* v. *Chaffee, supra,* 156 Cal. 611. The court nevertheless makes mention of *John D. Park & Sons Co.* v. *Hartman,* 153 F. 24, 39 [82 C.C.A. 158, 12 L.R.A. N.S. 135], where it was said that "the restrictions imposed by complainant upon sales and resales, if valid at all, are only so because they constitute personal contracts upon which an action will lie only against the contracting party."

Absent any California case directly in point, and none has been cited, we can only dispose of the question by analogy to what is already settled. As they involve realty, many covenants, though personal, are enforceable in equity against subsequent grantees and assignees who acquire the land with notice. "The marked tendency of our decisions seems to be to disregard the question of whether the covenant does or does not run with the land and to place the conclusion upon the broad ground that the assignee took with knowledge of the covenant and it was of such a nature that when the intention of the parties coupled with the result of a failure to enforce it was considered, equity could not in conscience withhold relief" (*Richardson* v. *Callahan,* 213 Cal. 683, 686 [3 P.2d 927]). In *Thew* v. *Thew,* 35 Cal.App.2d 691 [96 P.2d 826], a covenant contained in a property settlement agreement by which the husband agreed to pay the wife a percentage of profits from the sale of certain land was held enforceable against the husband's second wife who acquired the title to the property with full knowledge of the covenant. Directing the course and result of both cases just mentioned was the doctrine stated in *Whitney* v. *Union Ry. Co.,* 11 Gray (Mass.)

359 [71 Am. Dec. 715] : "The precise form of the nature of the covenant or agreement is quite immaterial. It is not essential that it should run with the land. A personal coveant or agreement will be held valid and binding in equity on a purchaser taking the estate with notice. It is not binding upon him merely because he stands as an assignee of the party who makes the agreement, but because he has taken the estate with notice of a valid agreement concerning it which he cannot equitably refuse to perform." If we adopt, as we do, the reasoning of the foregoing cases, there is no merit to appellant's claim that the restriction is nonenforceable for lack of privity.

As to the final point, that a restrictive covenant on the use of personal property may only be created by the producer of the goods, such claim overlooks the fact that the good will of a business, declared to be "property" (Bus. & Prof. Code, § 14102), is not limited to the field of manufacturing (*Smith* v. *Bull*, 50 Cal.2d 294 [325 P.2d 463]). In the present case there was indirect, if not direct, evidence that respondent would be irreparably injured in "the expectation of continued public patronage." (Bus. & Prof. Code, § 14100), specifically as it concerned the Southern Pacific, if the restriction was not enforced. Where, by nonperformance of a contract a person will be greatly embarrassed and impeded in his business plans, or involved in a loss of profits which a jury cannot estimate with any degree of certainty, equity will intervene. (*Senter* v. *Davis*, 38 Cal. 450, 453.) If equitable servitudes on chattels can be sustained on the theory that the producer has a proprietary interest therein for the benefit of his business, why not the purchaser-retailer of damaged goods who also has his own good will to maintain? In any event, "Equity does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention" (*Times-Mirror Co.* v. *Superior Court*, 3 Cal.2d 309, 331 [44 P.2d 547]). Under the peculiar, and perhaps unique, facts at bar, the trial court properly granted the preventive relief prayed for.

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.