## Clairol, Incorporated v. Sarann Co., Inc.

*Burton Caine, Judah I. Labovitz,* and *Wolf, Block, Schorr & Solis-Cohen,* for plaintiff.

*George J. Ivins,* for defendant.

SPAETH, J., August 25, 1965.

### NATURE OF THE CASE

Plaintiff, a manufacturer of hair care products and cosmetics, seeks to restrain defendant, which operates two discount stores, from selling plaintiff's product

"Miss Clairol Hair Color Bath" in a way that plaintiff says constitutes unfair competition and violates an equitable restriction.

## FINDINGS OF FACT

1. Plaintiff, a Delaware corporation, with its principal place of business in New York City, is engaged in the business of manufacturing and distributing hair care products and cosmetics which bear plaintiff's trademarks, which trademarks are registered in the office of the Commissioner of Patents in Washington, D. C. Plaintiff has not procured a certificate of authority to do business in the Commonwealth of Pennsylvania.

2. Defendant, Sarann Co., Inc., is a Pennsylvania corporation and operates two vitamin and cosmetic discount stores at 7407 Stenton Avenue and 109 Chelten Avenue, Philadelphia, Pa.

3. Among the products manufactured and sold by plaintiff is a hair coloring preparation containing coal tar dyes which is advertised and sold as "Miss Clairol Hair Color Bath" (referred to hereafter as "Miss Clairol").

4. All Miss Clairol sold in the Commonwealth of Pennsylvania is manufactured in Stamford, Conn., and is shipped by plaintiff in interstate commerce to purchasers in Pennsylvania.

5. Plaintiff sells and has traditionally sold its products, including Miss Clairol, to two different channels of trade, i. e. (1) the professional trade, consisting of beauty supply jobbers who resell to beauty salons for ultimate use by beauticians, and beauty schools for use in the training of such beauticians; and (2) the retail trade consisting of wholesalers, jobbers and direct buying retailers for ultimate resale to the general public for use by lay consumers at home.

6. Plaintiff sells professional Miss Clairol to all of its professional trade customers for approximately

$.39 per bottle. Plaintiff sells the retail package of Miss Clairol to retail jobbers for approximately $.67 and to direct buying retailers (department and chain stores) for approximately $.71. Plaintiff has no control over the price charged by its customers when they resell the product.

7. This price differential exists because $.39 is a competitive price in the beauty professional trade, and plaintiff desires to meet its competition. It is necessary for plaintiff to do so, because it is important to success in the retail trade that plaintiff receive the endorsement of the professional hairdresser. Plaintiff's competitors who sell in both channels of trade have similar price structures.

8. Prior to 1963, Miss Clairol was sold in the identical package to both the professional trade and the retail trade. This package consisted of a two-ounce bottle, bearing an identifying label, and enclosed in a bright yellow carton together with instructions both for the preliminary patch test and for use of the product.

9. In 1963, plaintiff introduced a new package for the professional trade, different from that previously used for the retail and professional trades.

10. There has been no change in the packaging of Miss Clairol for the retail trade.

11. The retail package of Miss Clairol presently in use (the design was changed in 1960) consists of an individual two-ounce bottle of hair coloring bearing a yellow label and detailed instructions for both the preliminary patch test and use of the product. Both the bottle and the instructions are enclosed in a bright yellow carton bearing plaintiff's trademark and the Good Housekeeping Seal of Approval. Each bottle label and each carton bear the following warning:

"Caution—this product contains ingredients which may cause skin irritation on certain individuals and

a preliminary test according to accompanying instructions should first be made. This product may not be used for dying the eyelashes or eyebrows; to do so may cause blindness."

12. The professional package of Miss Clairol consists of a single carton containing six two-ounce bottles of hair coloring. Also included in each carton is a single instruction sheet for the preliminary patch test. No instructions for use of the product are furnished. The hair coloring in the professional and retail package is chemically the same. The professional carton bears the warning quoted in finding 11 above and a similar warning is on each bottle label.

13. Each six-pack carton and the individual professional bottle labels bear the following cautionary statement:

"Professional Use Only
Warning

"Cautionary statements regularly required for sale to non-professionals and instructions essential to the use of this product by non-professionals are not included on bottle labels. Non-professional sale may result in prosecution under federal law."

14. Plaintiff does not sell professional packages to the retail trade or retail packages to the professional trade.

15. By changing the packaging of Miss Clairol for the professional trade, as described in finding 12 above, plaintiff realizes substantial annual savings of approximately $175,000. This saving, of about 1-4/10 cents per bottle, results from the elimination of individual cartons and instructions for each bottle which are unnecessary and superfluous for professionals.

16. If one uses Miss Clairol without instructions or without adequate instructions, any one of a number of adverse consequences may result. The user may experience a severe and harmful allergic reaction; if

rubber gloves are not used, the user's skin and finger-nails may be stained, and cuts and bruises on the hand may be subjected to painful stinging and burning sensations; if the wrong type of permanent wave solution is used after the application of Miss Clairol, substantial hair breakage or frizzling may result; the user may select and apply a shade which will not produce the desired color change or so misuse the shade she has selected as to fail to achieve the desired degree of lightening; hair may turn yellow or muddy brown if "Ermine" or "Starlight" is used alone; if a preliminary strand test is not performed, hair breakage or discoloration may result; even if hair breakage or discoloration are not caused by failure to perform a preliminary strand test, the user may experience unsatisfactory results from the use of Miss Clairol; and if Miss Clairol is used when the scalp contains cuts or other abrasions, painful stinging sensations will result.

17. The detailed instructions for use contained in each retail package of Miss Clairol are prepared to insure that the untrained lay consumer will obtain safe, satisfactory and glamorous results from use of the product. The instructions are carefully organized in logical sequence and type and color differences are used to obtain needed emphasis. As a result of the last major revision of the instructions, made in 1960-61, Miss Clairol obtained the Good Housekeeping Seal of Approval.

18. Miss Clairol is subject to chemical deterioration upon exposure to heat and light, which will alter the result achieved by use of the product. The individual retail carton protects the hair coloring from such exposure until after purchase, when the user removes the bottle from the carton. After such removal, the full contents of a bottle are normally used for a single application, and even if not, plaintiff's directions spe-

cifically state, "Discard any unused mixture; it becomes useless".

19. Plaintiff's use of a carton for its retail package is designed to assure receipt of the directions by each purchaser for home use. On the flap of the lid of the carton is printed the reminder: "READ ENCLOSED DIRECTIONS BEFORE USING". The retail carton also prevents breakage of the bottle, and consequent staining while the package is on the retail shelf, while it is being carried by the purchaser from the store to her home and while it is stored in the home before use.

20. Beginning at least as early as January 1964, defendant has continuously displayed, offered for sale and sold at retail, bottles of Miss Clairol which contain in red ink the warning: "PROFESSIONAL USE ONLY", etc., as described above. At all times defendant has displayed, offered for sale and sold such bottles without any carton and without instructions for use of the product.

21. On at least some occasions before the filing of the complaint in this action, defendant sold professional bottles of Miss Clairol, as described in finding 20, without any directions for performing the preliminary patch test for detecting hypersensitivity as required by Federal and State law. It is defendant's present practice to attach to each professional bottle of Miss Clairol displayed and sold by it an unsightly mimeographed sheet containing directions for the preliminary patch test. These sheets do not, however, contain any instructions for use of the product. These sheets are attached to the bottles by defendant either with scotch tape or a rubber band, and are likely to be separated from the bottle and lost. In addition, defendant's uncartoned bottles may break when handled by the consumer, resulting in staining of hands and clothing.

22. The mimeographed sheets attached by defendant to the professional bottles of Miss Clairol which it displays and sells are not adequate instructions for the preliminary patch test. Defendant's directions are inadequate patch test instructions for the following reasons:

(a) They do not give adequate emphasis to the importance of the preliminary patch test.

(b) They do not warn the user that Miss Clairol will stain skin and fingernails and that a cotton swab stick should, therefore, be used.

(c) They do not explain that Miss Clairol is to be mixed only with 20 volume peroxide rather than medicinal peroxide.

(d) They do not explain that if the user intends to mix more than one shade for application to her hair, the same mixture should be used for the patch test.

(e) They do not warn the user that hypersensitivity is something that can change and that the product should, therefore, be used immediately after negative results are achieved from the patch test.

(f) They do not warn that it is dangerous to apply Miss Clairol to the eyelashes and eyebrows.

(g) They do not warn that painful stinging will result if Miss Clairol is applied when there are cuts and scratches on the scalp.

The Clairol directions for the patch test deal with each of the above problems.

23. Defendant in its stores displays naked professional bottles of Miss Clairol, thus exposing the contents of the bottles to light, which will cause chemical deterioration of the product as set forth in finding 18.

24. The manner in which defendant sells Miss Clairol, described above in findings 20 and 21, constitutes a misrepresentation to the public, which is not

informed of the deficiencies in plaintiff's product caused by the method of sale used by defendant.

25. Plaintiff currently spends in excess of $25,000,-000 annually to advertise its products. In the past seven years, plaintiff has spent over $20,000,000 advertising Miss Clairol. Current annual advertising expenditures for Miss Clairol exceed $5,000,000.

26. Plaintiff's advertising of Miss Clairol always features a yellow retail carton, never the naked bottle.

27. Permanent hair coloring is a high anxiety product, for women are apprehensive that using it will affect their status, reputation and appearance.

28. The retail package of Miss Clairol was carefully designed to convey to the consumer that Miss Clairol is safe, effective, and produces glamorous results.

29. The bright yellow retail carton of Miss Clairol is a connecting link between plaintiff's advertising and the actual purchase of the product by the consumer. If the yellow carton is not present on the retail shelf, as pictured in plaintiff's advertising, the link may be broken, the value of plaintiff's advertising destroyed and the sale lost.

30. Very minor changes in the package of a product suggest to the customer a change in the product itself. This effect is magnified with a high anxiety product such as Miss Clairol.

31. The patch test instructions attached by defendant to the naked professional bottles of Miss Clairol which it sells lack the quality, professionalism and assurance associated with plaintiff and its products, including Miss Clairol. In addition, the consumer may conclude that plaintiff has carelessly neglected to supply information necessary to the safety of the consumer and that defendant is, therefore, filling this gap.

32. Should a customer of defendant suffer harmful or unsatisfactory results because she lacks adequate directions for the patch test and any instructions for

use of the product, she is likely to attribute such harm to plaintiff as the manufacturer.

33. Seizures of cosmetics as "adulterated" by Federal and State authorities receive wide publicity. If Federal or Pennsylvania authorities should institute legal proceedings and seize and destroy defendant's stock of Miss Clairol as being "adulterated" under the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, 52 Stat. 1040, 21 U. S. C. A. §361, §352 (a), or The Pennsylvania Drug, Device, and Cosmetic Act of September 26, 1961, P. L. 1664, Secs. 13 (c) and 14 (a), 35 PS §780-13 (c), the adverse publicity attendant upon such proceedings and seizures and such official characterizations of Miss Clairol would seriously injure plaintiff's goodwill and business reputation.

## DISCUSSION
### Jurisdiction

Defendant contends preliminarily that whatever the merits of plaintiff's action, this court lacks jurisdiction, because plaintiff's action is barred by its failure to procure a certificate of authority to do business in this State in accordance with the Business Corporation Law of May 5, 1933, P. L. 364, art. X, sec. 1014, as amended, 15 PS §2852-1014.[1] However, plaintiff is not barred. First, the statute is not applicable. Defendant's contention that there is a contractual relationship is based on the conversations between plaintiff's sales representative and defendant, but neither those conversations nor any other evidence indicates any basis for finding a contractual relationship, either express or implied. Whatever plaintiff's theory of recovery is, it is clear that plaintiff is not seeking ". . . recovery . . . on any . . . contract either express or implied

---

[1] Which provides: "No . . . action . . . shall be instituted or recovery had by any such corporation on any such contract, either express or implied, in any of the courts of this Commonwealth, , , ."

. . . ." [2] Second, even if the Business Corporation Law were applicable, a plaintiff's failure to obtain a certificate of authority will not deprive a court of jurisdiction to hear plaintiff's action; it will only deprive a plaintiff of capacity to bring suit, if plaintiff's failure is properly raised by preliminary objection; no such preliminary objection having been made in the case presently before this court, and a responsive answer having been filed by defendant, the defense that plaintiff lacked capacity to bring suit has been waived: Pennsylvania Rule of Civil Procedure 1032; Duro Art Supply Co. v. Auto Parts & Radiator Co., 29 D. & C. 2d 792 (C. P. Del. Co., 1963) ; Maxson, Appellant v. McElhinney, 370 Pa. 622, 624 (1952) (giving, as an example of lack of capacity, a plaintiff who has failed to register under the Fictitious Names Act) ; 4 Standard Pa. Prac. Objections to Complaint, §26, at 38; and Goodrich-Amram, §§1017(b)-14 (at 97) and 1032-2 (at 217).

## On the Merits

Plaintiff seeks a permanent injunction restraining defendant from selling Miss Clairol in any form other than in the complete retail package sold by plaintiff, the bottle as labeled for the retail trade, in plaintiff's box and with plaintiff's instructions.

Plaintiff contends in support of its prayer for relief that defendant's sale of Miss Clairol in the naked bottle, whether with or without the directions supplied by

---

[2] Plaintiff's claim that defendant's practices constitute unfair competition obviously sounds in tort; defendant's claim that its practices are not prohibited by the doctrine of unfair competition, if true, proves not that plaintiff's cause of action is in assumpsit (as defendant seems to contend), but that plaintiff has not stated a cause of action. Similarly, plaintiff's theory that defendant has violated an equitable restriction placed by plaintiff on Miss Clairol is based not on assumpsit but on property principles (for further discussion, see infra).

defendant, constitutes the tort of unfair competition.

Plaintiff is entitled to at least some protection. The evidence, and there was no defense offered, discloses that plaintiff tries to protect both its good will and the public, and tries to keep Miss Clairol safe and effective, by enclosing it in a carton, and by supplying adequate directions both for determining whether the user will have an allergic reaction and for the use of its product. But the manner by which defendant sells Miss Clairol demonstrates that defendant is unconcerned with whether plaintiff's product is safe or effective. Defendant somehow obtains the professional package of Miss Clairol, and, although it must be aware of the detrimental effects of its action, it sells Miss Clairol to the retail trade in the naked bottle, without a protective carton, without instructions for use and without adequate directions by which the consumer can give herself an allergy test.[3] The net result is that the consumer who buys Miss Clairol in the naked bottle from defendant, although she may think she is purchasing the safe, effective product she associates with plaintiff, is not getting it. But the consumer will attribute any unsatisfactory performance from Miss Clairol to plaintiff and not to defendant. Defendant thus uses plaintiff's goodwill to make sales, but acts in a manner which can only decrease plaintiff's goodwill, thus damaging an important property interest of plaintiff. It would seem, therefore, that plaintiff is entitled to protection from these acts of defendant.

Defendant resists this conclusion, urging that "the essence of unfair competition is either the imitation or the substitution of one manufacturer's goods for another". However, the law of unfair competition has not been so confined in Pennsylvania. Pennsylvania decisions containing language similar to defendant's

---

[3] This test omission on the part of defendant is a violation of State and Federal statutes. See infra.

statement of the law cannot be considered as limiting the doctrine of unfair competition to "passing off" : see 1 Nims, Unfair Competition and Trade-Marks, §9a, at 59-60 (1947) (analyzing the Pennsylvania cases). The Pennsylvania Supreme Court has gone beyond a "passing off" limitation: Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 448-56 (1937), and Pottstown Daily News Publishing Company v. Pottstown Broadcasting Company, 411 Pa. 383, 390-94 (1963). Indeed, an "assault" on goodwill in a non "passing off" (fair trade) case has been recognized as tortious conduct: Gillette Company v. Master, 408 Pa. 202, 211 (1962).

Thus, "passing off" is not the delineation of the area of unfair competition. We need not at this point determine the limits of that doctrine,[4] for, under established law, defendant has committed unfair competition. True, the precise point presented has not, with one exception, been passed upon in Pennsylvania. But the limited nature of the Pennsylvania decisions in the area of unfair competition and the need for consulting the Federal reports in this area has been specifically recognized by our Supreme Court. See Goebel Brewing Company v. Esslingers, Inc., 373 Pa. 334, 341 (1953). Therefore, in discussing the law, this court is free to supplement Pennsylvania decisions with decisions of other jurisdictions.

What then is the relevant law of unfair competition?

First, plaintiff need not prove that people who purchase Miss Clairol from defendant have actually blamed plaintiff for unsatisfactory performance; all that is necessary is that defendant's action be reasonably likely to deceive and confuse the public: Zimmerman v. B. & C. Motel Corporation, 401 Pa. 278, 281 (1960)'; Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 635 (1957); and Peters v. Machikas, 378 Pa. 52

---

[4] See discussion, infra.

(1954). Defendant's selling practices are reasonably likely to cause the public to believe it is getting a safe and effective bottle of Miss Clairol, although, in fact, this is not so.

Second, it is not necessary that plaintiff and defendant be in actual competition. See Safeway Stores, Inc. v. Sklar, 75 F. Supp. 98, 104 (E. D. Pa., 1947), quoting Judge Hand's famous statement; Esquire, Inc. v. Maira, 101 F. Supp. 398, 402 (M. D. Pa., 1951); Annotation, Actual competition as necessary element of trademark infringement or unfair competition, 148 A. L. R. 12, 22, 25; and 2 Nims, supra, §374.

Third, it is basic that unfair competition encompasses the selling of an article of inferior or indifferent quality identified with the manufacturer's trademark: Nims, supra, §297, and 3 Callman, Unfair Competition and Trade-Marks, §84.1(b) (2d ed., 1950), and supplement thereto; and see Wertheimer v. Milliken, 123 F. Supp. 358 (S. D. N. Y., 1954), Burlington Mills Corporation v. Roy Fabrics, Inc., 91 F. Supp. 39 (S. D. N. Y., 1950); R. B. Semler, Inc. v. Kirk, 27 F. Supp. 630 (E. D. Pa., 1938), and Coca-Cola v. Brown, 60 F. 2d 319 (M. D. Pa., 1932). This court finds that defendant has been misrepresenting to the public the quality of Miss Clairol when that product is sold in a naked bottle. This misrepresentation is solely the fault of defendant, which impliedly represents that the product contained in the naked bottle of Miss Clairol is safe and effective for consumer use.

Plaintiffs in situations very similar to the instant case have been granted relief. See Clairol, Incorporated v. Martin Wholesale Distributors, Inc., 35 D. & C. 2d 78 (C. P. No. 6, Phila. Co. 1964)[5]; Clairol Inc. v.

---

[5] In this case the court initially granted plaintiff only limited relief, covering, however, the omissions of defendant which have been discussed above. The decree was modified, and enlarged, however, to encompass an agreement of counsel.

L. H. Martin Value Center, Inc., 40 N. Y. Misc. 2d 875, 244 N. Y. S. 2d 210 (1963) ; Revlon, Inc. v. Crest Distributors, Inc., 190 N. Y. S. 2d 745 (1959), and Revlon, Inc. v. Regal Pharmacy, Inc., 29 F. R. D. 169, 173-77 (E. D. Mich., S. D. 1961), arising on a motion for summary judgment and containing an excellent discussion, although the force of the discussion is blunted considerably by the holding, on page 175, that "the element of misrepresentation involves a genuine issue of material fact". And in Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 635 (1957), in language fitting the instant case, although the facts are quite different, the court noted that "The trading on another's business reputation by use of deceptive selling practices or other means is enjoinable on the grounds of unfair competition".

Defendant relies very heavily on the case Prestonettes, Inc. v. Coty, 264 U. S. 359 (1924). But that case is distinguishable and inapplicable to this stage of the proceedings. First, the court noted that the action before it was not for unfair competition. Second, the court held that so long as the seller fully and fairly informed the public of the situation, it could state the way in which plaintiff's trademarked product was being used. In Champion Spark Plug Co. v. Sanders, 331 U. S. 125 (1947), defendant bought plaintiff's spark plugs, and reconditioned and resold them. At page 130, the court said: "Inferiority is immaterial so long as the article is clearly and distinctly sold as repaired or reconditioned rather than as new. The result is, of course, that the second-hand dealer gets some advantage from the trade-mark. But under the rule of Prestonettes, Inc. v. Coty, supra, that is wholly permissible so long as the manufacturer is not identified with the inferior qualities of the product resulting from wear and tear or the reconditioning by the dealer. Full disclosure gives the manufacture all the protection

to which he is entitled." Thus, the Prestonettes doctrine is inapplicable here.

Defendant contends that it has committed no tort because it sells Miss Clairol in the form in which plaintiff puts it on the market. This is erroneous, for plaintiff in no way intends that the naked bottle of Miss Clairol be sold to the retail market, and the resulting misrepresentation to the public by defendant cannot be laid at plaintiff's door. It is, therefore, clear that under the theory of unfair competition plaintiff is entitled to an injunction granting it certain minimum relief: plaintiff is entitled to be protected against adverse results from the retail sale of its product without a box, without adequate directions for a patch test or without adequate instructions for use.[6]

---

[6] There is another factor entitling plaintiff to this relief. Defendant's sale of Miss Clairol is in violation of section 601 of the Federal Food, Drug and Cosmetic Act of June 25, 1938, 52 Stat. 1054, as amended, 21 U.S.C.A. §361(a), and section 13 of The Drug, Device and Cosmetic Act of September 26, 1961, P. L. 1664, 35 PS §780-13(c), both of which require cautionary statements on the label and adequate directions for a patch test. Thus, defendant's stock of Miss Clairol is subject to seizure and condemnation: 21 U.S.C.A. §342, and 35 PS §780-12. Testimony at trial disclosed that if this happens, plaintiff will be substantially damaged. Plaintiff is, therefore, entitled to relief.

Defendant urges that because plaintiff has raised the violation of these statutes, this court is without jursidiction, since "a Court of equity is without power to enjoin violations of criminal acts". But this rule is inapplicable, for "the criminal nature of an act will not deprive equity of jurisdiction otherwise attaching": Commonwealth v. Gibney, 21 D. & C. 2d 5, 10 (C. P. Chester Co., 1959); and see Lanvin Parfums, Inc. v. LeDans, Ltd., 9 N.Y. 2d 516, 174 N.E. 2d 920, 922 (1961), and 30 C.J.S., Equity, §53.

Defendant also urges that plaintiff has unclean hands, because it itself is in violation of the above-mentioned statutes. This contention is incorrect as to the Federal act, which provides:

"A cosmetic [is] . . . adulterated . . . if it [is] . . . injurious to users . . . under such conditions of use as are customary or usual"; when a professional uses Miss Clairol, it is not, or should not be, injurious to users. The Pennsylvania act appears to have

But is plaintiff entitled to any protection beyond this under the doctrine of unfair competition? Plaintiff's evidence did establish that, even if plaintiff is given the relief outlined above, it will lose sales unless Miss Clairol is sold in the cartons provided by plaintiff,[7] and that plaintiff may be damaged by the use of instruction sheets other than the ones it prints.[8]

Is this enough? Unfair competition, encompassing as it does a large variety of practices, is difficult to pinpoint doctrinally. See, e.g., Green, Protection of Trade Relations Under Tort Law, 47 Va. L. Rev. 559, 565-66 (1961), and Note, Developments—Competitive Torts, 77 Harv. L. Rev. 888, 891 (1964). However, it would seem that a basic minimum requirement is that a defendant has been guilty of unfair dealing. See 1 Nims, supra, §1, and 3 Callman, supra, §84. As has been discussed above, defendant has been, and is now, guilty of such misconduct. If the court can, by decree, prevent defendant from selling inferior Miss Clairol as the regular product, is plaintiff entitled to more protection?

Defendant vigorously contends that this question must be answered negatively, on the basis that defend-

---

no similar saving provision. We need not decide whether that statute impliedly contains such a provision, for assuming, arguendo, that plaintiffs are in violation of the law, it is not such a violation, in light of the total circumstances, as would justify dismissing the complaint. "Application of the unclean hands doctrine is confined to willful misconduct which concerns the particular matter in litigation. . . . [I]n exercising his discretion, the chancellor is free to refuse to apply the doctrine if a consideration of the entire record convinces him that an inequitable result will be reached": Shapiro v. Shapiro, 415 Pa. 503, 507 (1964) ; and see Nims, supra, §390.

[7] This is so because plaintiff's advertising features this yellow box. When Miss Clairol is not sold in this box, doubts will be raised .in the· minds of some customers, and they will be hesitant to purchase Miss Clairol.·

[8] Because the physical features of such sheets are less attractive than the physical features of plaintiff's sheets.

ant only sells Miss Clairol in the form in which it comes from plaintiff. Where a defendant has been guilty of no misrepresentation, there is some support for this position: Independent News Co. v. Williams, 293 F. 2d 510, 517 (3d Cir., 1961). There is considerable force to the argument that once the court has prevented defendant from selling inferior Miss Clairol as Miss Clairol by ordering defendant to use adequate instructions for use, directions for a patch test, and cartons, any further injury to plaintiff results, not from a tort of defendant, but from plaintiff's choice of the methods to be used in marketing its product.[9] It must also be noted that the present case does not, in this aspect, present the same degree of unfairness as was present in Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433 (1937), relied upon so heavily by plaintiff, where the court was influenced by the fact that for the price of a record, defendant got something (the sound of plaintiff's orchestra) which would otherwise have cost him tens of thousands of dollars. (See 327 Pa. 452-453).

However, although the question of the scope of relief is a very difficult one, we decide it in plaintiff's favor. First, there is some authority for plaintiff's position. True, the Revlon and Clairol cases which have arisen in other jurisdictions are either not persuasive or are not authoritative on that point. But, in Bayer Co. v. Sum-

---

[9] It is interesting to note that in cases similar to the present one, relief has been granted on the ground, not available here, that defendant has induced plaintiff's customers to sell to him, in violation of their contract with plaintiff. See Revlon, Inc. v. Crest Distributors, Inc., 190 N.Y.S. 2d 745 (1959) ; Avon Products v. Berson, 135 N.Y.S. 2d 867 (1954) ; Revlon Products Corp. v. Bernstein, 119 N.Y.S. 2d 60 (1953), and Forstman Woolen Company v. Murray Sices Corp., 144 F. Supp. 283 (D.D.C. 1955). And Restatement, Torts, §§766-68, and Carpenter, Interference With Contract Relations, 41 Harv. L. Rev. 728, 754-62. But see Philadelphia Dairy Products v. Quaker City Ice Cream Co., 306 Pa. 164 (1932).

ner Printing Co., 7 F. Supp. 740 (E. D. Ohio, 1934), defendant repackaged plaintiff's product in packages of two, and sold it; defendant apparently placed a band with small printing across the package stating the real facts; the court found that the public believed that plaintiff was selling its product in packages of two; apparently, there was no other injury to plaintiff. The court granted an injunction, saying:

"If the plaintiff sells its products in the open market, it is not damaged by any truthful method of resale adopted by the purchaser, so long as such method does not make use of the trade-mark and display cards of the plaintiff in a way that leads the purchasing public to believe that the plaintiff has adopted that practice in marketing its product. The plaintiff is not required to submit to a new and wider use of its product by a merchandising practice which tends to confuse or deceive the public, and which will impair or prejudice its regular sales under its trade-mark . . . and in its original packages."

And second, ". . . where unfair competition is established, any doubts as to the adequacy of the relief are generally resolved against the transgressor". Moreover, ". . . the character of the conduct giving rise to the unfair competition is relevant to the remedy which should be afforded": Champion Spark Plug Co. v. Sanders, 331 U. S. 125, 130 (1947). Applying these rules to the facts, it is clear that plaintiff should be given the relief it seeks. Defendant's conduct has demonstrated a complete lack of concern as to the rights of plaintiff and the welfare of the public; the evidence indicates that only after the filing of the present complaint did defendant even try to conform with Federal and Pennsylvania statutes, and that was in a way which can be described as, at best, inadequate. Moreover, a decree only requiring a defendant to supply a box, adequate instructions for use and adequate direc-

tions for a patch test, is fraught with difficulties: What is "adequate"? Will not such a decree only engender further litigation to determine the meaning of "adequacy", even assuming good faith efforts on defendant's part? [10] On balance, we conclude that plaintiff is entitled to the relief it seeks, under the unfair competition doctrine.

In any event, however, we do not rest on this theory alone. Plaintiff has advanced another argument which also compels the conclusion that plaintiff is entitled to an absolute injunction. This argument is that plaintiff, by placing on the bottle of Miss Clairol destined for professional use the legend "Professional Use Only", has placed an equitable servitude or restriction on the bottle, thus preventing defendant from acting in violation of that restriction.

This court accepts plaintiff's contention, on the strength of Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 444-48, (1937). There, the court affirmed the granting of an injunction restraining defendant, a radio station, from broadcasting the records of plaintiff's orchestra. The records bore the label, placed on them by the phonograph company: "Not licensed for radio broadcast". The court, per Mr. Justice (later Chief Justice) Stern, held, at 445-46:

"Where public policy or some other determinative consideration is not involved, why should the law adopt an immutable principle that no restrictions, reservations or limitations can ever be allowed to accompany the sale of an article of personal property?. . . . [T]here have been many cases, notably in England, in which restrictive covenants and conditions accompany-

---

[10] Other questions would also arise: To what extent does the Prestonettes rule require that the instructions, directions and carton disclose that they emanate from defendant and not plaintiff? Can or must, defendant remove plaintiff's "Professional Use Only" label from the bottle of Miss Clairol?

ing the alienation of chattels have been enforced . . . .", [citing, inter alia; P. Lorillard Co. v. Weingarden, 280 Fed. 238 (W. D. N. Y., 1922), where the court preliminarily enjoined defendant from selling stale and inferior cigarettes in the United States, on the basis of an agreement between defendant and the company which sold to defendant, holding that a court of equity will enforce a restrictive covenant, if it is reasonable and made within proper limitations]. The court concluded generally that ". . . latitude should be allowed for intelligent discrimination in the enforcement of equitable servitudes on chattels. . . ." (page 447), and specifically that ". . . no valid reason exists why the restriction attached to the manufacture and sale of the records in this case should not be enforced in equity": page 448.[11]

The commentators have agreed on the need for a careful examination of the equitable servitude sought to be applied, in order to determine whether public policy will be furthered by its application. See e.g., Chafee, The Music Goes Round and Round: Equitable Servitudes and Chattels, 69 Harv. L. Rev. 1250, 1258, 1261-62. It seems clear that public policy will be furthered by permitting Clairol to prevent the retail sale of bottles of Miss Clairol which can have a detrimental effect on the health and welfare of the public. See Nadell & Co. v. Grasso, 175 Cal. App. 2d 420, 346 P. 2d 505 (1959), and Comments, 74 Harv. L. Rev. 617 (1961), and 9 DePaul L. Rev. 288, 290-91 (1960); P. Lorillard Co. v. Weingarden, 280 Fed. 238 (W. D.

---

[11] The controversy over equitable servitudes on personalty has not abated since Waring. See, e.g., Chafee, The Music Goes Round and Round: Equitable Servitudes and Chattels, 69 Harv. L. Rev. 1250 (1956); Independent News Co. v. Williams, 293 F. 2d 510, 517-18 (1961); Nadell & Co. v. Grasso, 175 Cal. App. 2d 420, 346 P. 2d 505 (1959), and comments thereupon at 74 Harv. L. Rev. 617 (1961); 12 Stanford L. Rev. 860 (1960); 17 Wash. & Lee L. Rev. 272 (1960), and 9 DePaul L. Rev. 288 (1960).

N. Y. 1922), and Chafee, Equitable Servitudes on Chattels, 41 Harv. L. Rev. 945, 946-49 (1928), one of the basic articles in the area.[12] Defendant has argued vigorously that plaintiff's marketing system is merely a facade, and that what plaintiff is seeking to do is to maintain its price structure by preventing retailers like defendant, who would ordinarily have to buy Miss Clairol from wholesalers, from getting that product at a cheaper price from beauty salon wholesalers. Despite the vigor of defendant's protestations, however, the fact remains that, at trial, plaintiff produced convincing and commercially reasonable reasons why it changed its professional and retail packages: to wit, it saved $175,000 per year by not printing cartons, instructions for use and directions for a patch test, which are unnecessary for the professional trade. Defendant produced not one word in support of its claim of price maintenance and did not shake plaintiff's witnesses on crossexamination.

There is, however, one serious problem with plaintiff's reliance on the theory of equitable servitudes. Most of the cases and articles on the subject seem to assume the existence of a contractual restriction agreed to between the buyer and seller, which is then enforceable against subsequent purchasers with notice. See, e.g., the discussion in Nadell & Co. v. Grasso, supra. There is no such express contractual restriction here. There does exist, however, an implied restriction, considering all of the circumstances of this case, including

---

[12] Containing, inter alia, the following statements: At page 946, "Each ambitious seller by expensive advertising and a vast network of dealers creates in the public the habit of expecting a well remembered product of supposedly high uniform quality in a uniform guise at a uniform price for a uniform quantity. Irregular and unauthorized departures from uniformity in any respect tear this pattern of thought and emotion which has been woven with so much trouble and cost. . . ." And see paragraph headed: "Restrictions on the form in which the article may be resold", at page 949.

the prominence of the legend and the fact that professional purchasers from plaintiff know that the basis of the price differential they get is their place in the marketing scheme. However, even if this were not so, Waring is authority for the proposition that a purchaser with knowledge of a restriction is bound thereby, regardless of whether the restriction is contractual in nature, for in that case the restriction was enforced, although it was not part of any contractual relationship between plaintiff and anyone in defendant's chain of title.[13] This court, therefore, holds that plaintiff is also entitled to the relief it seeks under the theory of equitable servitudes.

## CONCLUSIONS OF LAW

1. Plaintiff possesses a substantial goodwill and an excellent business reputation under its name Clairol and trademarks featuring that term, including Miss Clairol Hair Color Bath, which constitute valuable property rights, protectible in equity.

2. Defendant's conduct, as found above, has violated the law of unfair competition.

3. Defendant's conduct has further violated the equitable restrictions of servitude created by plaintiff, as found above.

4. Plaintiff has no adequate remedy at law.

5. Plaintiff is entitled to the injunction entered by this court on August 11, 1965.

---

[13] True, in response to defendant's argument that there was no contract between plaintiff and the record company, the court noted (at page 448) that "[t]here was . . . an understanding between them that the Talking Machine Co. would seek to prevent such use so far as lay within its power and would imprint the legend upon the records for that purpose". But this fact was not given any emphasis by the court, which went on to state that: "The notice used was fairly and reasonably sufficient to make purchasers realize the existence and extent of the restriction imposed upon their use of the records".

DECREE NISI

And now, August 11, 1965, it is hereby ordered and decreed as follows:

1. Defendant, Sarann Co., Inc., its agents, servants and employes, and all persons or instrumentalities subject to its control or affiliated or acting in concert with it, are enjoined and restrained from displaying for sale at retail, offering for sale at retail, or selling at retail, any Miss Clairol Hair Color Bath which:

(a) Is not labeled in accordance with the Federal Food, Drug and Cosmetic Act and the Pennsylvania Drug, Device and Cosmetic Act for products sold to untrained, lay consumers; or

(b) Does not bear instructions as furnished by plaintiff for the use of such product by untrained, lay consumers; or

(c) Is not enclosed in the original, single-bottle carton in which each such product was placed by plaintiff for sale to untrained, lay consumers; or

(d) Has on its label the statement:

"Professional Use Only Warning

"Cautionary statements regularly required for sale to non-professionals and instructions essential to the use of this product by non-professionals are not included on bottle labels. Non-professional sale may result in prosecution under federal law."
or

(e) Is not accompanied by the package insert placed by plaintiff in the carton for each of its products for sale to untrained, lay consumers; or

(f) has, or did have, any of plaintiff's labeling, including bottle labels, package inserts or bottle cartons that to the knowledge of defendant, or of its agents, servants or employes, or of any person or instrumentality under its control or affiliated or acting in concert with it, have been defaced, removed, altered,

amended or supplemented by anyone other than plaintiff.

2. Any person with knowledge of this injunction is restrained and enjoined from selling to defendant, or to any of defendant's agents, servants or employes, or to any person or instrumentality subject to defendant's control or affiliated or acting in concert with defendant, for displaying for sale at retail, for offering for sale at retail, or for sale at retail, any Miss Clairol Hair Color Bath that such person knows or should know is as described in any of the preceding subparagraphs 1(a) through 1(f).

3. Plaintiff shall recover from defendant all taxable costs of this action.

4. Plaintiff and defendant may each file exceptions to this decree within 20 days. If no exceptions are filed, the decree shall, upon praecipe, be entered by the prothonotary as the final decree.